UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
VINCENT BASCIANO,

                Petitioner,

      -against-

JERRY MARTINEZ, Warden of the
Metropolitan Correction Center,

                Respondent.
-------------------------------------------------------------X

REPORT AND
<u>RECOMMENDATION</u>
07 CV 421 (NGG) (RML)

LEVY, United States Magistrate Judge:

        On January 5, 2007, Petitioner Vincent Basciano ("petitioner" or "Basciano")
filed this habeas corpus petition, pursuant to 28 U.S.C. § 2241, for an order releasing him from
Special Administrative Measures and solitary confinement and returning him to the general
population at the Metropolitan Correctional Center ("MCC"). By order dated January 31, 2007,
the Honorable Nicholas G. Garaufis, United States District Judge, referred the petition to me for
a report and recommendation. I heard oral argument on March 22, 2007 and held a hearing on
April 16, 2007. For the reasons stated below, I respectfully recommend that the court order the
Bureau of Prisons to allow petitioner contact visits with his counsel. In all other respects, I
respectfully recommend that the petition be denied.

## BACKGROUND

        Familiarity with the underlying facts is assumed. Briefly, petitioner was arrested
on November 19, 2004 on an August 2003 indictment that had been superceded to add him as a
defendant on November 18, 2004. The 2003 indictment accused Basciano of racketeering and
illegal gambling and has since been superceded on a number of occasions.[1] A second indictment
was filed against Basciano on January 26, 2005, charging him with, *inter alia*, several counts of

---

[1] This indictment forms the basis of <u>United States v. Massino</u>, 03 CR 929 (NGG) (RML).

murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, and firearms-related crimes.[2]  Several of the crimes alleged in the most recent superceding version of the 2005 indictment occurred while Basciano was incarcerated pending trial on the 2003 indictment, including one charge of soliciting the murder of a federal law enforcement officer.  Basciano was tried on the 2003 indictment from February 27 to May 9, 2006.  Although the jury in that trial found him guilty of certain counts of racketeering, they could not agree on other charges, and jury selection for a second trial on the remaining charges in the 2003 indictment is scheduled to begin before Judge Garaufis on May 21, 2007.  On April 2, 2007, the government stated that it intends to seek the death penalty against Basciano on the 2005 indictment.  A trial date for the 2005 indictment has not been set.

After his arrest, Basciano was initially placed in "reception" in the Metropolitan Detention Center ("MDC") in Brooklyn, New York.  United States v. Basciano, 369 F. Supp. 2d 344, 346-47 (E.D.N.Y. 2005) [hereinafter, "Basciano I"].  He was released into the MDC general population in December 2004, and then was placed in the MDC's Special Housing Unit ("SHU") in January 2005, shortly before the second indictment against him was unsealed.  Id. at 347.  In March 2005, Basciano was transferred to Unit 10 South at the MCC in Manhattan, an area reserved for individuals that the government deems to be "of the highest security risk." (Affidavit of Kenneth Haas, filed Apr. 13, 2007 ("Haas Aff."), ¶ 6.)  Petitioner challenged his placement by letter filed in March 2005.  Judge Garaufis ruled on the issue on May 5, 2005.  He agreed with petitioner that the government had not produced sufficient evidence of Basciano's dangerousness to warrant housing him in solitary confinement, and he ordered the government to release Basciano into the general population at the MCC.  Id.  Petitioner remained in the general population from May 2005 until July 28, 2006.  On that date, petitioner was again transferred to

---

[2]  This indictment forms the basis of United States v. Basciano, 05 CR 60 (NGG) (RML).

the SHU and was informed that he was not to have any contact with anyone, "including his attorneys, investigators, or family members." (Petition for Writ of Habeas Corpus, filed Jan. 5, 2007 ("Pet. Br."), at 4.)

One month passed, during which petitioner's attorneys sought to ascertain the government's reasons for the new transfer. (Id. at 4-9.) Basciano's visits with counsel resumed sometime in early August 2006, but his visits with family and investigators continued to be limited. (Id. at 5-7.) On August 28, 2006, the government disclosed via a sealed letter that Basciano had been transferred because another MCC inmate had told the government that Basciano had provided him with a handwritten list of five individuals that Basciano wanted murdered. (Id. at 9.) The list included the judge and the lead prosecutor assigned to his criminal cases.[3] (Id., Ex. I.) Petitioner responded with an alternate explanation for the list, namely that it was "cultivated at the behest of a fellow inmate, who had advertised to Mr. Basciano that his mother was some sort of priestess who would be able to lift a spell which had been cast upon Mr. Basciano." (Pet. Br. at 9-10.) Basciano's attorneys arranged for his wife to meet with government investigators directly after receipt of the August 28 letter; according to the petition, Ms. Basciano spoke with these investigators and corroborated the story about the mystical nature of the list. (Id. at 10.) Petitioner also provided the name of an inmate, Reginald White, who he claimed would corroborate this story. (Id. at 11.) According to petitioner's brief, a lieutenant at the MCC interviewed the inmate who confirmed Basciano's explanation of the list.[4] (Id.)

---

[3] The list, attached to Exhibit I of petitioner's brief, is handwritten and reads: "Greg Andres / Judge Nickolas Garafis [sic] / Dominick Cicale / Tommy Lee / Lou Tartaglione." The last three names on the list are those of cooperating witnesses in Basciano's 2006 trial. Handwriting analysis, also submitted as part of Exhibit I to petitioner's brief, confirmed that the note was written by Basciano. Petitioner has never denied that he authored the note; he has only disputed the government's version of the note's purpose and import.

[4] The government states that Reginald White is not the inmate who came forward about the alleged hit list. (Government Opposition to Petition for Habeas Corpus ("Gov. Br."), at 8.)

On September 19, 2006 the government unsealed the August 28 letter, and at a September 21, 2006 conference it disclosed to petitioner and his counsel that it had received authorization from the Attorney General to impose Special Administrative Measures ("SAMs") on petitioner. (Id. at 12-13.) At that point, Basciano was transferred from the SHU at MCC to Unit 10 South, where he remains today. In Unit 10 South, Basciano is completely isolated from the other MCC inmates – he cannot speak with his neighbors in the cell block and his exercise time is solitary and indoors. (Pet. Br. at 13.) As of the April 16, 2007 hearing, he had no access to a radio or periodicals. (Id.) His room is illuminated and videotaped 24 hours a day.[5] (Id.) His cell has no windows, mattress, or pillow. (Id.) His personal visits are limited to a single agent-monitored, non-contact visit every two weeks.[6] (See Transcript of Mar. 22, 2007 Oral Argument ("Mar. 22 Tr."), at 3.)

Petitioner alleges that the conditions of his incarceration infringe upon his access to counsel and his ability to prepare for trial. (Pet. Br. at 14.) Pursuant to policy for all Unit 10 South inmates, petitioner's attorney visits are non-contact; they are conducted in two small rooms without desks which are divided by a screen. (Haas Aff. ¶ 12; Pet. Br. at 14; Mar. 22 Tr. at 6.) Basciano's attorneys must give any papers they wish to review with him to a guard before

---

[5] There was some discussion at the April 16, 2007 hearing regarding whether or not and for how long Basciano's cell is illuminated. The government asserted that, due to the tendency towards violence of the inmates in Unit 10 South, all inmates must be monitored 24 hours a day, and therefore a "faint" light is on during the night. (Haas Aff. ¶ 18.) Basciano's attorneys stated that, according to their client, the light was quite bright and made it difficult for him to sleep. (Transcript of April 16 hearing ("Apr. 16 Tr."), at 34.) However, Basciano has not submitted competent evidence to support his position.

[6] Basciano also complains that the BOP and DOJ are unreasonably restricting his visits with the five-year-old boy he had with Debra Kalb. (Mar. 22 Tr. at 3; Apr. 16 Tr. at 22-23.) Only members of Basciano's immediate family are permitted to visit with him. Thus, Ms. Kalb may not visit because she is not his wife. (Id.) The boy is too young to visit by himself. (Id.) Basciano has rejected offers to have the boy visit with members of Basciano's natural family. (Id.)

the visit begins.  They complain that this procedure is unreasonably time-consuming and impedes their ability to properly review documents with their client.  (Pet. Br. at 14; Mar. 22 Tr. at 5-6.)  Counsel are not permitted to leave papers with their client; rather, they must leave all documents in the MCC's central "legal drop box" through which all MCC inmates receive hand-delivered legal mail.[7]  (Mar. 22 Tr. at 5-6; Haas Aff. ¶ 16.)  Petitioner's counsel also complained that (1) the portion of the meeting room reserved for attorneys is too small to permit all members of the defense team[8] to comfortably meet with their client at the same time, (2) the attorney meeting rooms are not kept at a consistent temperature and have occasionally been uncomfortably hot or cold,[9] (3) simply getting to Unit 10 South involves additional levels of security which make it extremely time-consuming to meet with their client, and (4) these security provisions can severely hamper counsel's ability to meet with their client to prepare a defense; for example, bathroom breaks can take up to one hour due to prolonged security measures imposed on attorneys going in and out of Unit 10 South.  (Pet. Br. at 14; Mar. 22 Tr. at 5-13, 17-19.)

Besides hampering the attorney-client relationship, petitioner claims that his incarceration in Unit 10 South is hindering his ability to develop mitigating evidence for a potential death penalty phase of his trial.  (Letter of Ephraim Savitt, Esq., filed *ex parte* and

---

[7] Counsel for petitioner claimed at the March 22 oral argument that because prison staff must review the legal mail before delivering it to inmates, this process can take "several days" (Mar. 22 Tr. at 6).  However, the government contends that this process is applied to *all* inmates at MCC, not just those at Unit 10 South, and that it takes an average of "one working day" to get a document to an inmate.  (Haas Aff. ¶ 16.)

[8] The defense team consists of two trial counsel and two learned counsel, who are assigned to assist in preparation for a possible death penalty phase.

[9] Petitioner's counsel claimed at the March 22 oral argument that the guards at Unit 10 South had informed them "off the record" that the temperature is intentionally kept unpredictable because of the terrorist suspects housed in that unit of the MCC.  (Mar. 22 Tr. at 6-7.)  The government did not respond to this allegation.

under seal Feb. 7, 2007, at 2-3; Mar. 22 Tr. at 16-17, 20-21.)  Basciano's learned counsel,

Ephraim Savitt, argues that if his client reaches the sentencing phase on the death-eligible counts

against him and the government introduces evidence of the SAMs, the continued imposition of

the SAMs would prejudice the defense by creating a strong impression of future dangerousness.

(Mar. 22 Tr. at 20-21.)  Additionally, he argues, the mere fact of his confinement in Unit 10

South precludes Basciano from developing evidence of good behavior, which would be an

important mitigating factor in a future sentencing phase.  At oral argument, the government

stated that the imposition of the SAMs was not a trial strategy and that Basciano's prison

placement was an issue "completely separated" from the question of future dangerousness that

would arise at a potential death penalty phase.  (Mar. 22 Tr. at 27.)

Basciano filed this petition on January 5, 2007, seeking to be released into the

general population, or in the alternative, requesting that the court hold a factual hearing to weigh

the government's evidence of petitioner's dangerousness.  In opposition, the government asserts

that, if returned to the general population, Basciano would continue to participate in violent

crime.  It lists three separate reasons for the imposition of SAMs.  First, the government cites the

testimony of a cooperating witness, Dominick Cicale, from Basciano's 2006 trial.  (Government

Opposition to Petition for Habeas Corpus ("Gov. Br."), at 5-6.)  Cicale testified that while

incarcerated, Basciano had sent messages through his then-attorney, Tommy Lee, indicating that

Cicale had permission to kill Bonnano family member Michael Mancuso.  (Id.)

Second, the government alleges that Basciano conspired to murder Assistant

United States Attorney Greg Andres, who is the lead prosecutor in both the 2003 and 2005

indictments.  In its opposition papers and in a subsequent *in camera* proffer,[10] the government

---

[10]  The government submitted this proffer in the form of an *ex parte* affidavit, dated April 16, 2007; on that date I conducted a detailed *in camera* hearing, and questioned the Assistant United States Attorneys to assess the credibility of the affidavit.

described how it learned that Basciano had given another inmate at the MCC a list of five names with the understanding and intent that the inmate would arrange for the murders of the listed individuals. (Id. at 7-8; see supra, n. 3.) According to the government, when that inmate came forward with the information about the alleged hit list, agents thoroughly investigated his claims and concluded that his statements were credible and reliable. As corroboration of its allegations regarding the murderous nature of the list, the government also cited instances in taped conversations between Basciano and crime family associates in which petitioner had expressed hostility toward Andres. (Id. at 8-10.) Third, the government claims that it has credible information from another cooperator indicating that several inmates had plotted to harm a witness for the government – who was at the time detained at the MCC – on Basciano's behalf. (Id. at 11-12.) The government acknowledged at the March 22 oral argument that it had no evidence directly linking Basciano to this third conspiracy. Rather, it asserted that the evidence of the conspiracy tended to show that Basciano "has other people [at the MCC] who act in his interest," meaning that he would be even more dangerous were he returned to the general population. (Mar. 22 Tr. at 52-54.)

## DISCUSSION

This court has jurisdiction over Basciano's habeas petition under 28 U.S.C. § 2241. See Levine v. Apker, 455 F.3d 71, 78 (2d Cir. 2006); Boudin v. Thomas, 732 F.2d 1107, 1111 (2d Cir. 1984); Basciano I, 369 F. Supp. 2d at 348; United States v. Felipe, No. 94-CR-395, 1996 U.S. Dist. LEXIS 10239, at *1 n.2 (S.D.N.Y. July 19, 1996); Giano v. Sullivan, 709 F. Supp. 1209, 1212 (S.D.N.Y. 1989). Basciano is in custody under United States authority, and he challenges the legality of his placement within the MCC. See 28 U.S.C. § 2241(c) ("The writ of habeas corpus shall not extend to any prisoner unless – (1) He is in custody under or by color of the authority of the United States. . . ."). Although this type of petition does not lie within the

"core" of the habeas remedy for illegal confinement or incarceration, it is a permissible use of the writ in this circuit. See Preiser v. Rodriguez, 411 U.S. 475, 489 (1973); Boudin v. Thomas, 732 F.2d at 1111; see also Levine, 455 F.3d at 78 (holding that a challenge to the "execution" of a sentence – that is, the manner in which it is carried out – "is properly filed pursuant to § 2241").

Because it is a habeas petition, the Prison Litigation Reform Act does not apply; however, courts have developed a rule requiring petitioners in these cases to show that they have exhausted the administrative remedies in their prison or jail facility. Carmona v. United States Bureau of Prisons, 243 F.3d 629, 634 (2d Cir. 2001); Basciano I, 344 F. Supp. 2d at 348. Exhaustion is not a jurisdictional prerequisite; for instance, the government can waive the requirement by failing to raise it in its briefs. See United States v. McGriff, No. 04-CR-966, 2007 U.S. Dist. LEXIS 1402, at *3-4 (E.D.N.Y. Jan. 8, 2007). Here, Basciano filed several rounds of administrative complaints challenging his detention in the MCC SHU, all of which were denied by Bureau of Prisons ("BOP") administrative officials. (See Pet. Br., Exs. C, E, F, G, K, L, M.) The government maintains that these administrative challenges exhaust only the question of the SHU placement, but not the propriety of the imposition of the SAMs.[11] However, it has agreed to waive the question of whether Basciano has exhausted his administrative

---

[11] On August 13, 2006, Basciano filed his first administrative challenge via the MCC informal complaint resolution procedure, which was rejected on August 17, 2006. (Pet. Br., Ex. C.) His appeal to the MCC's Administrative Remedy Coordinator was rejected on August 27, 2006. (Pet. Br., Ex. F.) The Bureau of Prisons rejected Basciano's August 27, 2006 appeal on September 21, 2006. (Pet. Br., Exs. G, K.) On September 22, 2006, the government imposed the SAMs and Basciano was moved to Unit 10 South. He filed a second appeal with the BOP on October 3, 2006, in which he specifically complained about his second transfer and the conditions at Unit 10 South. (Pet. Br., Ex. L.) The BOP rejected the October 3 appeal on November 7, 2006, stating that Basciano had improperly raised new issues relating to the impositions of SAMs without first exhausting these issues using the informal resolution process at the MCC. (Pet. Br., Ex. M.) Petitioner states that he filed one last administrative appeal in November 2006, with the General Counsel for the BOP, which was also denied. (Pet. Br. at 22.)

remedies. (Gov. Mem. at 3 n.1.) Due to this waiver, the court need not decide whether Basciano's challenge to the SAMs must be exhausted separately.

The Supreme Court set forth the principal test for challenging pretrial prison conditions in Bell v. Wolfish, 441 U.S. 520, 538-39 (1979). Under Bell, Basciano bears the burden of showing that the conditions at Unit 10 South were "imposed for the purpose of punishment," and that they are not merely "an incident of some other legitimate purpose." Bell, 441 U.S. at 538. Punishment, the Court held, is unconstitutional unless there has been some fair adjudication of guilt. Id. at 535. If a court finds that the prison officials did not have an express intent to administer punishment, and that the challenged conditions are merely "an incident of some other legitimate governmental purpose," that condition will withstand constitutional scrutiny. Id. at 538. However, even if a condition is not punitive, it may be unconstitutional if a court finds that it "appears excessive in relation" to the government's proffered alternative purpose. Id. at 538-39 (citation omitted). Bell also cautioned lower courts to tread carefully when issuing orders to prison officials, stating:

> [i]n determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "[such] considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

Id. at 540 n.23 (quoting Pell v. Procunier, 417 U.S., 417, 827 (1974)).

Basciano alleges that his segregation in Unit 10 South is unconstitutional, first because it unduly infringes upon his liberty interests without affording him an evidentiary hearing and second because it interferes with his ability to prepare his defense. (Pet. Br. at 24-26, 30-33.) He claims that the government's evidence regarding his alleged dangerousness is

insufficient to justify the continued imposition of SAMs, and that the evidence presented in his petition contradicts and outweighs the government's proffer. (See, e.g., id. at 33.) In the alternative, petitioner argues that the conditions are unconstitutional punishment in violation of Bell, and that they are an exaggerated and arbitrary response to Basciano's actions. (Id. at 33-36.)

The government counters that Basciano has not shown himself to be capable of living in the general population without engaging in "obstruct[ion] of justice and . . . violence." (Gov. Br. at 1.) The imposition of the SAMs and the conditions at Unit 10 South, it argues, are "reasonably related" to "the legitimate purpose of inhibiting Basciano's demonstrated and recent efforts to send communications to obstruct justice and engage in violence." (Id.) The government also argues that Basciano has the burden of proving by "substantial evidence" that these conditions are unconstitutional, and that the government need only offer "some evidence" of dangerousness to rebut petitioner's claims and thereby justify any and all conditions of confinement. (Ltr. of AUSA John Buretta, dated Apr. 6, 2007 ("Apr. 6 Gov. Ltr."), at 3-5.)

I find that Basciano has not met his burden of showing that the imposition of SAMs and his placement in Unit 10 South are unconstitutional conditions of confinement.[12] However, as an initial matter, I disagree with the government's characterization of the applicable legal standard. The government correctly cites Bell in stating that petitioner must put forth "substantial evidence" that his prison conditions are an excessive response to his alleged actions. (Id. at 2-3.) However, the government goes on to contend that under Bell, once the government puts forth "some evidence" of petitioner's dangerousness, the court must wholly defer to any and all conditions of confinement imposed in the MCC. (Apr. 6 Gov. Ltr., at 3-5.) For this

---

[12] That is, the general outlines of Basciano's confinement are not unconstitutional, based on the record before me. However, with respect to the MCC's policy of non-contact visitation between Basciano and his attorneys, I find otherwise. See infra.

proposition, the government cites <u>Superintendent v. Hill</u>, 472 U.S. 445 (1985), which held that when analyzing prison disciplinary board decisions, a showing that "some evidence" supported the board's decision is enough to uphold the decision. <u>Id.</u> at 455-56. I am not convinced that this case is analogous to <u>Hill</u>. In making this argument, the government seems to suggest that even if Basciano were to present overwhelmingly convincing evidence that he is capable of complying with prison regulations if placed in the general population, this court could not intervene in the administration of the MCC – so long as the government presented a "modicum" of evidence tending to show the contrary. (Apr. 6 Gov. Ltr. at 3-5.) At any rate, it is unnecessary to engage in a lengthy discussion of what the evidentiary standard should be in this case, as the evidence Basciano presents does not outweigh that which has been proffered by the government.

Indeed, the evidence of Basciano's dangerousness is substantial. Both parties have provided transcripts of petitioner's 2006 trial and of recorded conversations between Basciano and his associates. These transcripts, along with the government's *in camera* proffer regarding the alleged hit list, convincingly portray a troubling pattern of criminal activity conducted within the confines of federal detention facilities. The relevant trial transcripts consist mostly of government cooperator Dominick Cicale's testimony. At Basciano's 2006 trial, Cicale stated that he had sought permission from petitioner to kill a crime family associate, Michael Mancuso, while Basciano was incarcerated at MDC in Brooklyn. (<u>See</u> Trial Transcript ("Tr."), at 5844-45.) Cicale stated that he used Tommy Lee, then an attorney for Basciano, to pass messages in and out of the MDC facility. (<u>Id.</u> at 5834, 5839-45.) Lee also testified against Basciano at the 2006 trial and confirmed that he had been a messenger for crime family associates both in and out of custody. (<u>Id.</u> at 6882-83.) However, on cross-examination, Lee acknowledged that Basciano had also stated that Cicale and Mancuso should try to "all get

along" and that there was no direct message that Cicale should harm Mancuso.  (Id. at 6906-08.)

        In addition to the messages passed to criminal associates through Tommy Lee, there is evidence that, while housed in the MCC's general population, Basciano discussed crime family business with associates who were also incarcerated.  Several of these conversations were recorded.  (See Apr. 6 Gov. Ltr., Exs. A, B.)  On two occasions in January 2005, Basciano and Joseph Massino, a co-defendant in Basciano's 2003 indictment, discussed a number of matters touching upon criminal activity they had participated in after their arrest.  Basciano and Massino discussed, *inter alia*, passing messages from the crime family to Basciano through Lee and Basciano's son; the merits of their previous conversations about whether or not to murder AUSA Greg Andres; and the intricate difficulties of conducting crime family business from behind bars.  (See, e.g., Apr. 6 Gov. Ltr., Ex. A at 11-12, 34-35, 37; Ex. B at 30-38.)  These two conversations took place with the government's permission (Massino was wearing a wire) and within the Eastern District of New York's holding pen.  However, the government argues that these discussions establish that if released into the general population, Basciano is not likely to refrain from communicating about crime family business with associates inside and outside of prison.  (See, e.g., Apr. 6 Gov. Ltr. at 6.)

        Most problematic for Basciano is the government's evidence regarding the alleged "hit list."  The government submitted an *in camera* affidavit outlining the details provided by the cooperating witness who gave the government the list.  I reviewed the affidavit and examined the prosecutor closely to determine the credibility and reliability of the informant's statements.  I agree with the government that revealing the details of the *in camera* proffer and affidavit would unduly expose the government's cooperating witness to danger.  The instant record, including the recorded conversations and Basciano's 2006 conviction on racketeering charges, shows that Basciano has extensive contacts in organized crime, such that

revealing the identity of a cooperator could expose the witness or his family to grave danger. The same record lends credence to the government's contention that the alleged hit list was part of a genuinely violent endeavor that Basciano had the capacity to accomplish.

The statements described in the *in camera* proffer strongly indicate that the handwritten list of five names was intended to serve as a hit list. The government has presented convincing evidence that it has conducted an extensive investigation of the reliability of this witness and his statements. I therefore agree that the government has demonstrated that Basciano would present a significant security risk if returned to the general population. This is a valid security interest under Bell v. Wolfish; therefore, the imposition of SAMs was not arbitrary. Further, given the credibility of the evidence regarding petitioner's dangerousness, I find that the imposition of SAMs and Basciano's placement in Unit 10 South is not an exaggerated response to the government's security concerns.[13] Because the other solitary confinement cells in the MCC's SHU are adjacent to one another, they allow inmates to communicate with one another. (Haas Aff. ¶ 5.) Therefore, the government insists, Unit 10 South is the only place in the facility where they could house Basciano while ensuring his isolation from potential criminal associates. (Id.) Although the conditions in Unit 10 South are indeed harsh, and may not represent an ideal balance of the facility's security concerns and the

---

[13] Petitioner cites several decisions in arguing that the government has not presented sufficient evidence of Basciano's dangerousness to justify his placement and conditions. (See Defendant's Reply to Government's Opposition to Petition for Writ of Habeas Corpus, dated Feb. 16, 2007, at 6.) However, in the cases he cites, the courts ordered pretrial detainees to be released from solitary confinement where there was *no* evidence whatsoever of that defendant's particular tendency to commit violence while incarcerated. See, e.g., United States v. McGriff, No. 04-CR-966, 2007 U.S. Dist. LEXIS 1402 (E.D.N.Y. Jan. 8, 2007); United States v. Catalan-Roman, 329 F. Supp. 2d 240 (D.P.R. 2004); United States v. Ayala-Lopez, 327 F. Supp. 2d 138 (D.P.R. 2004); United States v. Suleiman, No. 96-Cr.-933, 1997 U.S. Dist. LEXIS 5793 (S.D.N.Y. May 1, 1997); United States v. Gotti, 755 F. Supp. 1159 (E.D.N.Y. 1991); Boudin v. Thomas, 533 F. Supp. 786 (S.D.N.Y. 1982). Here, the government has set forth convincing evidence of just such a tendency.

petitioner's liberty interests, the law does not permit the court to intervene in the intricacies of the MCC's administration to broker a more individually-tailored confinement program. The Supreme Court has strongly cautioned federal courts against second-guessing the judgment of prison officials. <u>See, e.g.</u>, <u>Lewis v. Casey</u>, 518 U.S. 343, 387 n.9 (1996); <u>Bell</u>, 441 U.S. at 540 n.23.[14] For the above reasons, I find that, on the record before me, the petitioner has not met his burden of demonstrating that placing him in Unit 10 South was an excessive, arbitrary, or punitive measure in violation of Supreme Court precedent.[15]

Although the imposition of SAMs and Basciano's placement in Unit 10 South are not unconstitutional conditions, I must separately address the most troubling single circumstance of Basciano's incarceration – his non-contact visitation with his attorneys. In the two hearings I held on this matter, Basciano's counsel vividly described the volume of documents they must review with their client during a typical meeting and the lengthy and burdensome process entailed by the requirement that this review be conducted through a screen with two sets of

---

[14] The present circumstances are quite different from those before Judge Garaufis on May 5, 2005, when he ordered Basciano removed from Unit 10 South and returned to the general population. At that time, Judge Garaufis found that the government's explicit purpose in placing Basciano in administrative detention was not punitive but the "indisputably legitimate" goal of preventing the chief of a dangerous crime family from "communicating with other members of the family about the organization's criminal activities." <u>Basciano I</u>, 369 F. Supp. 2d at 351. However, Judge Garaufis also found the government's chosen means–indefinite and solitary confinement– excessive because "the government had not linked [Basciano's] infractions to discrete criminal planning or conduct of any kind." <u>Id.</u> Here, the existence of the list, combined with the government's proffer, demonstrates the kind of planning and conduct that Judge Garaufis found lacking in 2005.

[15] Petitioner's counsel also suggests that Basciano's mental condition is deteriorating as a result of the lack of human contact or access to a radio or non-legal reading materials. (<u>See</u> Pet Br. at 30; Mar. 22 Tr. at 15-17; Apr. 16 Tr. at 23, 29-30, 33.) The record before me does not support such a claim. It is also unclear whether the BOP is still restricting petitioner's access to reading materials or a radio. The United States Attorney's Office has no objection to allowing Basciano access to a radio and conceded on April 16, 2007 that the question had been "lost in the shuffle." (Apr. 16 Tr. at 10-11.) Similarly, although the government stated that it has no objection to allowing Basciano access to periodicals, it had not granted him such access by the April 16 hearing. (<u>Id.</u> at 11.) Neither party has updated the court on this issue since that date.

documents, rather than side by side. (See Mar. 22 Tr. at 6; Transcript of Apr. 16 hearing ("Apr. 16 Tr."), at 24-26.) Defense counsel repeatedly emphasized that the time lost through this cumbersome procedure was impairing their ability to prepare for trial in both the 2003 and 2005 indictments. (See, e.g., Mar. 22 Tr. at 18-19.) The United States Attorney's Office does not object to Basciano's request to have contact visits with his attorneys, although it disagrees with his contention that the non-contact visits infringe upon his right to counsel. (See Mar. 22 Tr. at 31; April 16 Tr. at 10, 17.) The prosecution has stated that the government sees no possibility that Basciano intends to use his current counsel in criminal schemes of any kind; nor does it believe that Basciano presents a danger to his attorneys. (Apr. 16 Tr. at 18-19.) The SAMs themselves do not proscribe contact visits with counsel. (See Pet. Br., Ex. J at 3 ("Attorney/Client Privileged Visits – May be contact or non-contact, at the discretion of the USMS/BOP/DF.").) Thus, in the instant record, the one and only proffered reason for the requirement of non-contact visits with counsel is that this arrangement is the BOP policy for all inmates housed in Unit 10 South without exception. (See Haas Aff. ¶ 14; Apr. 16 Tr. at 10-11.)

In an affidavit submitted in opposition to the petition, Kenneth Haas, Unit Manager of Unit 10 South at the MCC, explained that on one occasion in 2000, an inmate housed in Unit 10 South attacked and gravely injured a guard at the MCC using a comb he had sharpened into a weapon. (Haas Aff. ¶ 8.) It was later discovered that this inmate, a known terrorist, also planned to assault and take hostage his own attorneys. (Id.) As a result of this single incident, all Unit 10 South inmates are now denied contact visits with counsel. (Id. ¶¶ 11, 14.) Haas argues that to operate any differently with respect to Basciano would open the door to all inmates in Unit 10 South seeking to individually tailor their conditions of confinement. (Id. ¶ 17.) This, he continues, would "raise numerous security concerns with managing 10-South as a

Unit." (Id.) He does not specify precisely what those concerns might be and whether they can be addressed without significant difficulty.

Applying the Bell v. Wolfish test, I find that petitioner has presented substantial evidence that the requirement of non-contact visits with his attorneys infringes upon his right to counsel and is an exaggerated response to the government's security concerns. There is ample and undisputed evidence in the record that this requirement impinges upon petitioner's right to prepare his defense and confer with his attorneys. See Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001) ("unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the" Sixth Amendment"); Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pre-trial detainees have a substantial due process interest in effective communication with their counsel . . . . When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised."); Lynch v. Leis, No. C-1-00-274, 2002 U.S. Dist. LEXIS 27604, at *17 (S.D. Ohio Feb. 19, 2002) ("Absent justification, restrictions which impose severe constraints on a pretrial detainee's ability to contact his attorney and discuss matters of substance violate the Sixth Amendment.").

The Supreme Court elaborated on Bell in Turner v. Safley, holding that if a court finds that a prison regulation or condition "impinges on inmates' constitutional rights," the condition is still valid if it is "reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). However, as the Second Circuit ruled in a case similar to the one at bar, "[w]here the regulation at issue imposes pretrial, rather than post-conviction, restrictions on liberty, the 'legitimate penological interests' served must go beyond the traditional objectives of rehabilitation or punishment." United States v. El-Hage, 213 F.3d 74, 81 (2d Cir. 2000) (citing

-16-

McGinnis v. Royster, 410 U.S. 263, 273 (1973)).  Turner was a challenge by convicted inmates

to their conditions of confinement; hence, its relationship to cases involving pretrial detainees is

unclear.  The Second Circuit has stated:

> Turner involved convicted prisoners rather than pretrial detainees,
> and the standard it promulgated depends on "penological
> interests."  Penological interests are interests that relate to the
> treatment (including punishment, deterrence, rehabilitation, etc. . .)
> of persons convicted of crimes.  Although some of the concerns of
> pretrial detention, especially protection against further criminal
> conduct, overlap with the concerns of penology, there are
> important differences.  Penological interests are therefore arguably
> not an appropriate guide for the pretrial detention of accused
> persons.

Benjamin, 264 F.3d at 187 n.10.  See also Demery v. Arpaio, 378 F.3d 1020, 1028-29 (9th Cir.

2004) (noting that Turner was inapposite where the case dealt with conditions of pretrial

confinement); Turkmen v. Ashcroft, No. 03-CV-2307, 2006 U.S. Dist. LEXIS 39170, at *146-48

(E.D.N.Y. June 14, 2006) (stating that courts should use caution in applying Turner to challenges

of pretrial conditions of confinement); Lynch, 2002 U.S. Dist. LEXIS 27604, at *13 (finding

Turner "helpful" in determining baseline standards but noting that it was "not directly

applicable" to pretrial detainees).  But see Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993)

(holding that Turner applies equally to both convicted and pretrial inmates).

     In Benjamin, the Second Circuit considered what standard to use when

determining the constitutionality of conditions in New York State's pretrial facilities.

Ultimately, the court did not rule on the appropriate standard, finding that the challenged

conditions "would not survive scrutiny under Turner, if in fact that standard is applicable."  264

F.3d at 187 n.10.  This court more recently stated that, despite the differences between pretrial

detainees and convicted prisoners, "the Turner standard proves useful nonetheless in balancing

the government's legitimate interests against the [pretrial detainee] plaintiffs' asserted rights." Turkmen, 2006 U.S. Dist. LEXIS 39170, at *147. Here, as the Second Circuit did in Benjamin, I find it unnecessary to rule on which test is most appropriate for this type of case. However, I will assess the reasonableness of the non-contact visits under Turner because I find this condition is unconstitutional even under the "legitimate penological interests" test.[16]

Turner lists four factors courts should consider when assessing the reasonableness of challenged conditions. 482 U.S. at 89-91. First, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89 (internal citation omitted). Second, courts must consider "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. A "third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id. Fourth, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id.

With respect to the first of the four Turner factors, Basciano has shown that the attorney non-contact rule is an excessive response to the government's legitimate interest in prison security and is not rationally related to the actual threat presented by Basciano at this time. The United States Attorney conceded that Basciano poses no threat to his legal team and that there is no reason to believe that his current attorneys would assist Basciano in any criminal undertaking. (Apr. 16 Tr. at 18-19.) One inmate's violent incident some years ago does not justify the MCC's imposition of non-contact attorney visits on all inmates housed in the Unit,

---

[16] It was not necessary to apply Turner to the analysis of the imposition of SAMs or the placement in Unit 10 South generally because Basciano did not satisfy the standards set forth in Bell.

without exceptions.  The BOP's vague and conclusory invocation of "numerous security concerns" if Basciano were allowed contact visits is not enough.  (See Haas Aff. ¶ 17.)  By this logic, any condition imposed on Unit 10 South, including entirely prohibiting attorney-client meetings as a means of preventing attorneys from relaying oral messages to criminal associates outside the prison, would be reasonably related to the government's interest in preventing inmate violence.  Recently, the Supreme Court explained that "Turner requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."  Beard v. Banks, 126 S. Ct. 2572, 2581 (2006).  To support the imposition of a condition that significantly burdens Basciano's right to prepare a defense, the BOP must articulate a justification reasonably related to an actual threat to security or the orderly operating of the institution.  The government has failed to do so.

The second and third Turner factors also weigh in petitioner's favor.  Although BOP has not prohibited Basciano from meeting with his attorneys, the record is clear that the attorney non-contact rule has substantially impaired counsel's ability to review essential and voluminous documents with their client in the limited time available to them.  (See, e.g., May 22 Tr. at 5-20; Apr. 16 Tr. at 24-29.)  The government has presented no evidence to suggest that attorney contact visits would impose a strain on prison resources or have an adverse effect on other inmates.  BOP is free to impose different SAMs conditions on inmates, depending on their individual circumstances. Other than a conclusory statement in the Haas Affidavit, the government has made no showing that allowing Basciano contact visits with his attorneys would have a significant detrimental effect on other inmates or guards.

Finally, counsel for the petitioner have stated, and the government does not

dispute, that there are rooms in Unit 10 South that could be used for contact visits with counsel in this case. (Apr. 16 Tr. at 14-15.) Thus, it would appear that it is feasible for the government to provide an adequate space for Basciano and his attorneys to have contact visits within Unit 10 South. Indeed, the government has never contended that it lacks either the facilities or the personnel to provide attorney contact visits, or that such visits would pose any – much less an unreasonable – logistical problem for the facility. Certainly, some number of contact visitation rooms must exist within the MCC, as only the Unit 10 South prisoners are denied contact visits with attorneys. (See Haas Aff. ¶ 11.) Because ready alternatives clearly exist, the fourth <u>Turner</u> factor does not apply here.

The Supreme Court has noted that "the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." <u>Maine v. Moulton</u>, 474 U.S. 159, 170 (1985). Here, the court is mindful that the government has chosen to seek the death penalty against Basciano in the 2005 indictment. As a result, our judicial system affords him heightened protections and rights to ensure his ability to prepare fully for trial and possible sentencing. <u>See, e.g.</u>, <u>United States v. Ayala-Lopez</u>, 327 F. Supp. 2d 138, 144 (D.P.R. 2004) ("We note that as a pretrial detainee and as a capital defendant, Defendant enjoys greater protections.") (citing <u>Schiro v. Farley</u>, 510 U.S. 222, 238 (1994) (Blackmun, J., dissenting); <u>Fischer v. Winter</u>, 564 F. Supp. 281, 298 (N.D. Cal. 1993)). Where, as here, a life may be cut short by the state, the courts must be especially careful to ensure that a defendant's due process rights are not unnecessarily infringed.

While there is no absolute Sixth Amendment right to contact visits with attorneys,

some courts have found that non-contact attorney visits, without appropriate justification, violate the Sixth Amendment right to counsel and access to the courts. See Mann v. Reynolds, 46 F.3d 1055, 1061 (10th Cir. 1995); Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994); Ching v. Lewis, 895 F.2d 608, 610 (9th Cir. 1990); Dreher v. Sielaff, 636 F.2d 1141, 1146 (7th Cir. 1980); but see Casey v. Lewis, 4 F.3d 1516, 1520 (9th Cir. 1993). In the context of prisoners seeking contact visits with their post-conviction counsel, the Seventh Circuit noted that "an inmate's opportunity to confer with counsel is a particularly important constitutional right which the courts will not permit to be unnecessarily abridged." Dreher, 636 F.2d at 1146; see also Mann, 46 F.3d at 1061 (remanding to district court to apply the Turner factors where non-contact visitation policy appeared without justification and interfered with prisoners' right of access to the courts). Surely this principle must apply *a fortiori* to defendants who are still preparing their defense for trial in a capital case, as well as their mitigation submission for a potential penalty phase.

The court addressed this question in Basciano's first habeas petition in May 2005, noting that, at the time, it was "of the utmost importance that Basciano be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty against him," and that "Basciano's detention in the SHU presents both practical and psychological obstacles to this result. As a practical matter, the security restrictions in place in the SHU make it much more difficult for Basciano to have productive meetings with his counsel." Basciano I, 369 F. Supp. 2d at 352. In this petition, counsel have presented convincing evidence that their attorney-client relationship is hampered by this visiting arrangement. The stakes are high for Basciano and his legal team, and absent more compelling

reasons to restrict his legal visits, I respectfully recommend that the court order the Bureau of Prisons to allow Basciano to hold contact visits with his attorneys at the MCC forthwith.

## CONCLUSION

For the reasons stated above, I respectfully recommend that the court grant Basciano's petition with respect to contact visits with his attorneys and deny it with respect to all other challenged conditions of confinement. Any objection to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Garaufis and to my chambers, within ten (10) business days. Failure to file objections within the specified time period waives the right to appeal the district court's order. <u>See</u> 28 U.S.C. § 636(b)(1); <u>see also</u> Fed. R. Civ. P. 72, 6(a), 6(e).


Respectfully submitted,



_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
        May 25, 2007