UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
VINCENT BASCIANO,

                    Petitioner,

           - against-

CAM LINDSAY, Warden of the Metropolitan
Detention Center,[1]

                 Respondent.
-------------------------------------------------------X

**MEMORANDUM AND ORDER**

07-CV-421 (NGG) (RML)

GARAUFIS, United States District Judge.

      Petitioner Vincent Basciano ("Basciano" or "Petitioner") is currently detained in the

Metropolitan Detention Center ("MDC") in Brooklyn, where he awaits trial on charges for which

he faces a possible death sentence. Basciano petitions for a writ of habeas corpus pursuant to 28

U.S.C. § 2241, in which he seeks an order lifting the Special Administrative Measures

("SAMs")[2] currently governing his confinement and releasing him from a Special Housing Unit

("SHU") back into the general prison population. (Petition for Writ of Habeas Corpus (Docket

Entry #1) ("Petition").) On January 31, 2007, this court referred the Petition to Magistrate Judge

---

[1] Basciano originally filed his petition against Jerry Martinez, Warden of the Metropolitan Correctional Center. However, Basciano has since been moved to the Metropolitan Detention Center in Brooklyn, where he continues to challenge his conditions of confinement. Therefore, the court substitutes the Warden of that facility as Respondent.

[2] SAMs are implemented pursuant to 28 C.F.R. § 501.3(a), which provides that "[u]pon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury. . . . These procedures may be implemented upon written notification to the Director, Bureau of Prisons, by the Attorney General."

1

Robert M. Levy for a Report and Recommendation ("R&R"). (Docket Entry #3.) On May 25, 2007, Judge Levy issued an R&R recommending that this court grant the petition only with respect to allowing Basciano contact visits with his attorneys but recommending that the court deny the petition in all other respects. (Docket Entry # 17.)

On June 5, 2007, Basciano timely filed objections to the R&R, and at a September 27, 2007 hearing, the court granted Basciano's newly appointed counsel leave to file additional papers to supplement the habeas petition. On October 24, 2007, Basciano filed an amended petition; on November 3, 2007, he filed an additional supplemental memorandum; on November 21, 2007, the Government filed its opposition; and on November 28, 2007, Basciano filed a reply. While Basciano requests an Order lifting the SAMs and releasing him from the SHU, he requests in the alternative an evidentiary hearing to present witnesses who would purportedly controvert the Government's bases for subjecting Basciano to such restrictive conditions of confinement. In addition, since Judge Levy's R&R Basciano has been allowed contact visits with his attorneys, which thus renders this particular aspect of his habeas petition moot. Basciano now argues, however, that his conditions of confinement negatively affect the contact visits with his attorneys that he is currently allowed.

For the reasons set forth below, the court adopts the conclusions contained in Judge Levy's R&R and rejects the additional arguments Basciano has since set forth in favor of his petition. As a result, Basciano's petition for habeas corpus, or in the alternative to be granted an evidentiary hearing, is DENIED.

I.     **Background**

Given the lengthy history of Basciano's two pending criminal cases before the court and

the extent to which his current conditions of confinement are predicated upon evidence dating back to the earliest days of his confinement, it is necessary for the court to provide a thorough overview of this history as background for its decision.

A.  Procedural History

Basciano was arrested on November 19, 2004 and charged by a Superseding Indictment with racketeering and gambling in Case No. 03-CR-929.  (Docket Entry #165 (November 18, 2004 Superseding Indictment).)  The charges included conspiracy to murder and murder of Frank Santoro.  (Id. at 17.)  On May 9, 2006, a jury found Basciano guilty of racketeering conspiracy but deadlocked on the charges pertaining to the Santoro murder.[3]  At a July 2007 retrial that took place after Judge Levy issued his R&R, a jury again found Basciano guilty of racketeering and also found him guilty of all charges pertaining to the Santoro murder.[4]  I presided over both of these trials.

In the meantime, on January 26, 2005, the Government indicted Basciano under docket number 05-CR-060.  (Docket Entry #1, January 26, 2005 Indictment.)  The Indictment charged Basciano with, *inter alia*, murder in aid of racketeering of Randolph Pizzolo and discussed information in the Government's possession suggesting that Basciano had solicited the murder of Assistant United States Attorney Greg Andres ("Andres"), who prosecuted the 03-CR-929 case. (Id.)  The solicitation allegedly took place in late 2004 while Basciano was incarcerated pending

---

[3] Specifically, the jury found Basciano guilty of racketeering conspiracy, including, among others, racketeering acts of illegal gambling and of conspiracy to murder and attempted murder of David Nunez.  (Verdict Sheet in Case No. 03-CR-929 dated May 9, 2006.)

[4] In addition to the Santoro charges, the jury found Basciano guilty of the racketeering acts of solicitation to murder Dominick Martino and Salvatore Vitale, additional illegal gambling charges, and marijuana distribution.  (Verdict Sheet in Case No. 03-CR-929 dated July 31, 2007.)

trial on the 2003 indictment.  (Id.)  Basciano was formally charged with soliciting Andres's

murder in a June 25, 2005 Superseding Indictment, in which he was also charged with conspiracy

to murder Patrick DeFilippo, a member of the Bonanno crime family.  (Docket Entry #65 in 05-

CR-060.)  DeFilippo was tried with Basciano in the original trial in 03-CR-929.[5]

   B.   Conditions of Confinement Since November 2004 Arrest

   Basciano's conditions of confinement have changed several times since his November

2004 arrest.  After a brief initial stay in "reception" at the MDC, where he was not permitted any

visitors or contact with other detainees, he was released into the general prison population in

December 2004.  United States v. Basciano, 369 F. Supp. 2d 344, 346-47 (E.D.N.Y. 2005)

(Garaufis, J.) ("Basciano I").  In January 2005, Basciano was placed in the SHU at the MDC

shortly before the indictment in Case No. 05-CR-060, which charged him with the Pizzolo

murder and first set forth the Government's belief that he had conspired to murder Andres, was

unsealed.  Id. at 347.

   Basciano remained in the SHU at the MDC until March 2005, when he was moved to

Unit 10 South at the Metropolitan Correctional Center ("MCC") in Manhattan.  The unit is

considered the most secure housing unit available at any Bureau of Prisons ("BOP") facility in

the New York City Metropolitan Area and is generally reserved for terrorism suspects and other

inmates considered to be a danger to other inmates and/or prison guards.  Id.  While housed in

Unit 10 South, Basciano's contact with visitors, including his attorneys, was sharply curtailed

based on the Government's contention that the conditions were necessary to prevent Basciano

---

[5] DeFilippo was found guilty of racketeering conspiracy, including illegal gambling acts, conspiracy to murder and attempted murder of David Nunez, and extortionate collection of credit.  (Verdict Sheet in Case No. 03-CR-929 dated May 9, 2006.)

from directing the affairs of the Bonanno crime family from prison, including ordering acts of violence. Id. Specifically, the Government argued that, in addition to his involvement in the plot to kill Andres, Basciano had ordered the Pizzolo murder from the MDC. Id. at 349.

This court granted Basciano's request to be released back into the general prison population, concluding that the Government had not "made a sufficient showing that Basciano was engaged in planning acts of violence while in pre-trial detention" and that there was nothing to distinguish Basciano from "the hundreds of individuals in pre-trial detention who are accused of having committed violent acts *before* they were detained." Id. at 351 (emphasis in original). Specifically, I concluded that "the facts currently before the court suggest that if Basciano ordered the Pizzolo murder, he did so *before* he entered MDC-Brooklyn" and that the allegation was thus insufficient to justify detention under the harsh conditions of the SHU. Id. at 352. Further, I concluded that "the tape recordings, standing alone, do not sufficiently substantiate the government's allegation that Basciano conspired to kill a federal prosecutor while in detention or at any other time." Id. I noted that "[t]he government may well possess other evidence concerning this purported, and as yet uncharged, conspiracy. If it does, however, it has not presented it to this court for consideration." Id.

In addition to finding the Government's evidence insufficient to warrant Basciano's continued detention in the SHU, I noted that the restrictions were hampering Basciano's efforts to fight the Government's efforts to seek the death penalty against him because "[a]s a practical matter, the security restrictions in place in the SHU make it much more difficult for Basciano to have productive meetings with his counsel" and "long periods of solitary confinement can have devastating effects on the mental well-being of a detainee." Id. at 352-53. Given these realities,

the court held that the "nuclear option" of indefinite solitary confinement was inappropriate "until it is clear that less restrictive options have failed to constrain Basciano." Basciano was released into the general population pursuant to the court's May 5, 2005 Order. Id. at 353.

Basciano remained in general population at the MCC until July 28, 2006, when he was again transferred to the SHU. (Petition for Writ of Habeas Corpus ("Pet. Br.") at 4.) On August 28, 2006, the Government disclosed under seal that Basciano's transfer back to the SHU was the result of another inmate having informed the Government that Basciano had provided him with a handwritten list of five individuals that Basciano wanted murdered. (Id. at 9.) The list included myself, the lead prosecutor Greg Andres, and three cooperating witnesses who had testified against Basciano in his 2006 trial. (Id. Ex. I.) Basciano responded at the time that the list was intended to lift a spell that had been cast on him, and he stated that inmate Reginald White had corroborated Basciano's account when interviewed by a lieutenant at the MCC. In an interview with Government investigators shortly after the list was discovered, Basciano's wife, Angela Basciano, also corroborated the story about the mystical nature of the list. (Id. at 9-10.)

On September 21, 2006, the Government informed Basciano and his counsel that it had received authorization from the Attorney General to impose SAMs on Basciano. (Id. at 12-13.) Basciano was then transferred from the SHU at MCC to Unit 10 South, where he was again under extremely restrictive conditions of confinement. (Id. at 13.) Subsequent to Judge Levy's R&R, Basciano has been moved back to the MDC, where he is housed in the SHU and remains under SAMs, and in early October, the Department of Justice extended the imposition of the SAMs applicable to Basciano for an additional one-year term. (Government's October 3, 2007 letter to the court at 1.) Shortly after the move to the MDC, Basciano's attorneys informed the

6

court that the conditions there were "markedly worse" than those at the MCC, citing to the MDC's failure to provide Basciano with personal hygiene items and the absence of a desk or chair in his cell.  (Defense Counsel Ephraim Savitt's letter to the court dated October 10, 2007.)  However, in recent conferences and oral argument before the court, these particular concerns appear to have been remedied.  In addition, according to representations to the court at oral argument on December 20, 2007, Basciano currently is allowed one phone call per week to his lawyers and two family visits per month.  Basciano requested an increase in these allowances and an amendment to the SAMs allowing greater phone and correspondence privileges with his five-year-old son, Anthony Kalb, and Anthony's mother, Debra Kalb.  The Government did not object, and the court encouraged the Government and BOP personnel present at the hearing to consider the feasibility of granting reasonable requests for additional visits and phone calls with family members.

   D. <u>Evidence of Basciano's Dangerousness</u>

   In its submissions before Judge Levy and before this court, the Government has cited, among other things, the following specific evidence of Basciano's dangerousness as justifications for the restrictive conditions under which he is currently incarcerated:

   (1) <u>Authorization to Murder Michael Mancuso</u>:  At Basciano's Spring 2006 trial, cooperating witness Dominick Cicale ("Cicale") testified that while Basciano was incarcerated, Cicale sought and received permission from Basciano to kill new acting boss of the Bonanno family, Michael Mancuso.  The following exchange occurred during Cicale's testimony:

Q:  Did you ever seek permission to kill Michael Mancuso?
A:  Yes, I did.
Q:  Who did you ask for permission to kill Michael Mancuso?

A:    Vincent Basciano.
Q:    Where was Mr. Basciano at the time?
A:    MDC Brooklyn.
Q:    How did you communicate with him?
A:    Through Tommy Lee. . . .
Q:    Did you get permission to kill Michael Mancuso[?]
A:    Yes, I did. . . .
Q:    What message did you get back?
A:    Don't be a duck, do it.  If you feel threatened, do what you have to do.
Q:    What did you understand that to mean?
A:    If I felt threatened, I had the permission to kill Michael Mancuso.
Q:    Did you plan the murder of Michael Mancuso?
A:    Yes I did.

(Basciano Trial Transcript dated March 24, 2006 at 5844-45.)

Cicale then testified that he had enlisted P.J. Pisciotti ("Pisciotti") to kill Mancuso.  (<u>Id.</u> at 5845-

46.)

        In addition, cooperating witness Thomas Lee ("Lee") testified that after Cicale sent a

message through Lee to Basciano stating that Mancuso was "giving Dominic [sic] a hard time,"

Basciano sent a message back stating that "Dominic [sic] shouldn't back down to anyone."  (<u>Id.</u>

at 6882-83.)

        The defense counters by pointing to testimony from Lee suggesting that Basciano wanted

Cicale and Mancuso to get along:

        Q:    Isn't it true that the message that you told the FBI that Mr. Basciano sent back to
              Dominick Cicale was–[s]top the fighting and why can't you all get along, wasn't
              that the message that was sent from Mr. Basciano?
        A:    That was part of the message.

        (<u>Id.</u> at 6907.)

The defense also points to testimony from cooperating witness Pisciotti suggesting that Cicale

did not, in fact, enlist him to kill Mancuso:

8

| Q: | Do you recall planning to kill Michael Mancuso and using a boat to dump his body? |
|---|---|
| A: | No. |
| Q: | Do you recall talking with Dominick Cicale about how Michael Mancuso could be killed? |
| A: | No. |
| Q: | Did you have any discussions with Dominick Cicale about killing Michael Mancuso? |
| A: | No. |

(Basciano 2007 Retrial Transcript at 3570.)

(2) <u>Desire to Harm AUSA Andres</u>: When the court considered Basciano's 2005 request to be released from the SHU at the MCC, the Massino Tapes were the sole evidence before this court regarding the alleged plot against Andres. In its opposition to the instant petition, the Government cites the alleged June 2006 hit list with Andres's name on it as further evidence of Basciano's desire to harm Andres. (Government's Memorandum of Law in Opposition to Defendant Vincent Basciano's Petition for Habeas Corpus ("Gov't. Br.") at 7-8.) The Government also points to a June 18, 2006 recorded telephone conversation between Basciano and his girlfriend, Debra Kalb, in which he told her that Andres is "a little fuckin' prick" who "thinks he's god" and is "a dangerous kid." (<u>Id.</u> at 9.) In the Government's view, this language mirrored language that Basciano used in a conversation referring to the murder of Randolph Pizzolo and thus was "reasonably interpreted" as an effort to convey to Kalb that Andres should be harmed. Finally, the Government noted a January 17, 2007 social visit between Basciano and three of his sons in which Basciano stated that Andres is "sharp" but an "ego maniac." In the Government's view, the comment is "disturbing" in light of Basciano's other comments about Andres and because he made the comment to family members who had also demonstrated violent tendencies. (<u>Id.</u> at 10.)

(3) <u>Request for Permission to Murder Patrick DeFilippo</u>:  The Government also cites the

January 7, 2005 Massino recording to support the contention that Basciano, while incarcerated,

asked Massino for permission to kill Patrick DeFilippo.  (April 6, 2007 letter from the

Government to Judge Levy at 7.)  In the recorded conversation, Massino and Basciano had the

following exchange:

| | |
|---|---|
| Basciano: | Well, I think I have a problem livin' in the same world with this guy. |
| Massino: | With who . . .  Patty? |
| Basciano: | Yeah.  If you . . . if you guarantee me, if you guarantee me, if you says Vinny, listen to me.  I guarantee ya that this guy'd never come up to you, step up to you, I'll leave him alone.  And if you told me to leave him alone, I'll leave him alone. |
| Massino: | No, you gotta leave him alone, Bo. |
| Basciano: | That's all . . . No problem, done. . . . Cause I'll . . . I'll, I'll be very disturbed with him over here. |
| Massino: | This, this, that's, killin' people is not the answer. |
| Basciano: | Alright. |
| Massino: | Listen to Joe. |
| Basciano: | Done.  Done. |

(<u>Id.</u> Ex. B. Transcript of January 7, 2005 Recording at 37-38.)

(4) <u>The Government's *in camera* submission to Judge Levy Regarding the Alleged Hit</u>

<u>List</u>:  In its submission to Judge Levy, the Government presented details of the evidence upon

which it based its conclusion that the list with five names on it written in Basciano's handwriting

was in fact a hit list.  The Government also presented its reasons for concluding that its evidence

was reliable.  Of the evidence that was submitted *in camera*, the Government has revealed to the

defense and made part of the public record only the basic contours of the allegation:  that

Basciano gave the list to another inmate and told the inmate that he wanted the people on the list

murdered.

D.    Judge Levy's R&R

After hearing oral argument and holding a hearing, on May 25, 2007, Judge Levy issued an R&R in which he recommended granting Basciano's request for contact visits with his attorneys, but recommended denying the petition in all other respects.  (Docket Entry #17.) Applying the test for assessing the constitutionality of pre-trial prison conditions set forth in Bell v. Wolfish, 441 U.S. 520, 538-39 (1979), Judge Levy found that "Basciano has not met his burden of showing that the imposition of SAMs and his placement in Unit 10 South are unconstitutional conditions of confinement" because "evidence of Basciano's dangerousness is substantial."  (R&R at 10-11.)

Judge Levy found that transcripts of Basciano's 2006 trial, recorded conversations between Basciano and his associates, and the Government's in camera proffer regarding the alleged hit list, "convincingly portray a troubling pattern of criminal activity conducted within the confines of federal detention facilities."  (Id. at 11.)  Specifically, Judge Levy pointed to Cicale's testimony that he sought permission from Basciano to kill Michael Mancuso when Basciano was at the MDC.  Judge Levy also pointed to discussions between Basciano and Massino about passing messages to and from Basciano prior to his incarceration and to previous discussions about whether or not to murder Andres as support for his conclusion as to Basciano's dangerousness.  (Id. at 12.)

"Most problematic" for Basciano, according to Judge Levy, "is the government's evidence regarding the alleged 'hit list.'"  (Id.)  Judge Levy stated that, after reviewing the Government's in camera affidavit and "examin[ing] the prosecutor closely to determine the credibility and reliability of the informant's statements," he believed the proffer "strongly

indicates that the handwritten list of five names was intended to serve as a hit list. The government has presented convincing evidence that it has conducted an extensive investigation of the reliability of this witness and his statements." (Id. at 12-13.) Therefore, Judge Levy concluded that the Government had shown that Basciano would present a significant security risk if returned to the general population and that the imposition of SAMs and placement in Unit 10 South was not an arbitrary or exaggerated response to the Government's security concerns. (Id. at 13.) Finally, Judge Levy recommended that Basciano be allowed contact visits with his attorneys because the restriction was infringing on his right to counsel and hampering his ability to prepare his defense. (Id. at 14-22.)

     E.    The Parties' Arguments

As an initial matter, Basciano argues that Judge Levy deprived him of his right to confront his accuser and his due process right to ensure that any information that forms the basis for the SAMs is reliable. (November 3, 2007 Revised Supplemental Memorandum in Support of His Habeas Petition ("Petitioner's Br.") at 11.) In support, Basciano asserts that principles from the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), "guard[] against undisclosed, non-testimonial hearsay from a secret source as the foundation for pre-trial punishment" and that this case requires "heightened reliability of evidence on which severe pre-trial conditions are based given the impact the conditions ultimately could have on Basciano's ability to mount a defense and his right to counsel in a death-penalty case." (Reply Memorandum in Support of Defendant's Habeas Petition ("Petitioner's Reply") at 8-9.)

In challenging Judge Levy's conclusions, Basciano first argues that the alleged "hit list" is not a sufficient basis for imposition of the SAMs and placement in SHU. (Petitioner's Br. at 6.)

Basciano contends that several months prior to discovery of the "hit list," MCC Officer Marco Santomaggio intercepted a similar list ("List No. 1") from the outgoing mail of inmate Reginald White, which contained over a dozen names, including that of the judge, prosecutor, defense lawyers and additional witnesses expected to testify at Basciano's retrial. (Id. at 7.) According to Basciano, this list was turned over to the FBI but was never the basis of any murder plot allegations. (Id.) In addition, Basciano contends that on August 28, 2006, yet another list of names ("List No. 3") was discovered, consisting of about a dozen names, including the names of witnesses and defense lawyers from the trial in case number 03-CR-929 trial. The names are preceded by an alleged Santeria[6] spell that seeks to remove the "negativity" from those named on the list. (Id. at 8.)[7]

In sum, Basciano contends that the other two lists strongly suggest that the alleged hit list was also a Santeria list. He offers the names of six witnesses — inmate Peter Lionous, inmate Danny Reyes, inmate Reginald White, Officer Chancioso, Lieutenant Johnson, and inmate Paul Villanueva — whose testimony he claims will show that all three lists were made for the purpose of performing a Santeria ritual. (Id. at 15-21.) Basciano urges the court to consider that Judge Levy was not presented with the information from these witnesses, stresses that Judge Levy was

---

[6] According to an online entry at the Encyclopaedia Britannica website, Santeria is "the most common name given to a religious tradition of African origin that was developed in Cuba and then spread throughout Latin America and the United States." See http://www.britannica.com/eb/article-9065626/Santeria.

[7] This court has had the benefit of reviewing Lists #1 and #3, which the government produced at a December 20, 2007 hearing. Both lists, with only slight variation between the two, include an incantation at the top of the lists that reads "Before the house of the judge, three dead men look out the window, one having no tongue, the other no lungs, and the third was sick, blind and dumb," and each includes many names — List #1 has eleven names and List #3 has twenty three names. (See December 20, 2007 Hearing Transcript at 38; Court Exhibits No. 2 and 3.)

also not aware that Basciano's account of the list could be supported by two MCC officials, and urges the court to hold an evidentiary hearing to resolve this "factual dispute." (Petitioner's Reply at 2, 14.) Furthermore, Basciano contends that the alleged "hit list" is in truth the only reason for holding Basciano in SHU and under SAMs, given that his removal from general population immediately followed discovery of the list and that the other allegations on which the restrictions are purportedly based predate his removal from general population or have already been found insufficient to keep him out of general population. (Id. at 17-19.) Finally, Basciano contends that Judge Levy's conclusion that the list was a hit list is in conflict with this court's decision that the list was an attempt to manipulate this court's recusal. (Id. at 21.)

Basciano also argues that Thomas Lee's testimony that Basciano ordered Cicale to get along with Mancuso undermines reliance on Cicale's testimony that Basciano implicitly authorized Cicale to murder Mancuso. (Petitioner's Br. at 13-14.) Finally, Basciano argues that the SHU and SAMs restrictions are depleting his ability to focus on assisting in his defense in a death-penalty case and are keeping his attorneys from fulfilling their responsibility to develop penalty-phase mitigation evidence, in part based on Basciano's inability to have a relationship with his five-year-old son. (Id. at 22-24.) In support, Basciano cites to this court's previous decision returning him to general population, in which the court stated that "[t]he foremost factor informing my conclusion [to release Basciano from SHU] is the reality that Basciano is a death-eligible defendant whose attorneys are now preparing to make a mitigation submission to the Attorney General. It is therefore of utmost importance that Basciano be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty." (Petitioner's Reply at 11-12); (May 5, 2005 M&O at 12-13.)

14

The Government responds that reliance on the *in camera* submissions did not violate Basciano's Confrontation Clause right because it is a *trial* right, as specifically held in Crawford v. Washington, 541 U.S. 36 (2004). (Government's Memorandum of Law In Opposition to Defendant Basciano's . . . Revised Supplemental Memorandum Regarding His Habeas Petition for Release from Special Administrative Measures ("Gov't Br.") at 44-45.)

Second, in addition to the "hit list" evidence submitted to Judge Levy, the Government argues that: (1) Basciano's history of passing messages regarding Bonanno family criminal activities from prison, (2) Cicale's testimony regarding Basciano giving him permission from prison to kill Mancuso if Cicale felt threatened and, (3) the charged solicitation to kill Andres as discussed on the Massino Tapes all support Judge Levy's finding of dangerousness. (Id. 45-49.)

Finally, the Government argues that an evidentiary hearing is not necessary because the Government does not dispute that the proposed testimony would be consistent with Basciano's version of the alleged hit list as a Santeria list, and because the testimony "does not call into question the substance of the government's ex parte submission to Judge Levy." Further, "[t]ellingly, Basciano had the opportunity to submit affidavits from these witnesses to Judge Levy, but did not do so." (Id. at 50.)

## II1. Discussion

This court conducts *de novo* review of a magistrate judge's report and recommendation where, as here, timely written objections have been filed. Nowlin v. Greene, 467 F. Supp. 2d 375, 378 (S.D.N.Y. 2006). A review of pre-trial detention conditions proceeds under the standards set forth by the Supreme Court in Bell v. Wolfish, 441 U.S. 520, 535 (1979). "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in

accordance with due process of law." Id. at 535.  Thus, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Id. at 538.  Absent an express intent to punish, the determination generally turns on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Id. at 538-39.

Accordingly, a pretrial condition will not amount to punishment if it "is reasonably related to a legitimate governmental objective," but will if it is "arbitrary or purposeless. . . ." Id. at 539.  In addition, the Supreme Court has cautioned that a court must be mindful that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Id. at 540 n.23, 547 ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.")  (citations omitted).

The Second Circuit has used the four-factor test set forth in Turner v. Safley, 482 U.S. 78, 87 (1987), to evaluate whether a pretrial detainee's conditions of confinement, which included the imposition of SAMs, violated his due process rights where the detainee argued that the conditions impaired his ability to prepare his defense.  See United States v. El-Hage, 213 F.3d 74, 81-82 (2d Cir. 2000) (per curiam).  The court must determine (1) whether there is a "valid, rational connection" between the regulation and the legitimate governmental interest used to

justify it; (2) whether there are alternative means for the prisoner to exercise the right at issue; (3) the impact that the desired accommodation will have on guards, other inmates, and prison resources; and (4) the absence of "ready alternatives." Id. at 81.

As an initial matter, Basciano's argument that the *in camera* proffer to Judge Levy violated his confrontation rights under Crawford v. Washington, 541 U.S. 36 (2004) is unavailing. The holding in Crawford was explicitly limited to the right of confrontation as it applies to the use of testimonial statements of witnesses absent from trial. Crawford, 541 U.S. at 59. The defense cites no authority other than Crawford for its contention that the *in camera, ex parte* proffer violated Basciano's due process rights as a general matter, and this court has found none. Accordingly, this court declines to extend Crawford to the current circumstances of this petition.

As to the merits, El-Hage appears to the court to be the Second Circuit case most closely analogous to the instant case, and as such it warrants extended discussion. In El-Hage, the defendant had been charged with six conspiracies to kill United States citizens and destroy United States property abroad as a key participant in the al Qaeda terrorist organization. El-Hage, 213 F.3d at 77. An affirmation by an Assistant United States Attorney alleged that El-Hage had played a significant role in al Qaeda as Osama Bin Laden's close associate, which included a role in conveying military orders from Bin Laden directing terrorist acts, and an allegation as to El-Hage's "overall dangerousness." Id. at 78. During his pretrial detention, El-Hage was subjected to solitary confinement for the first fifteen months — though he was subsequently permitted to have a cellmate — and to SAMs — though the Government revised his conditions to allow him seven extra minutes of time in each phone call to his family, to

provide him a plastic chair so he could review documents more comfortably, and to allow him three calls per month to his family, rather than the one call per month usually allowed inmates in administrative detention.  Id.

The court concluded that the Government had supported its assertions that the SAMs were reasonably related to the non-punitive objective of protecting national security with "ample evidence of the defendant's extensive terrorist connections."  In addition, because El-Hage's dangerousness arose out of the information he might communicate to others, the court concluded that it was reasonable for the government to find the alternative of confinement in general population "unacceptable."  Id. at 81-82.

Finally, the court rejected El-Hage's argument that he was entitled to an evidentiary hearing below because the Government had not identified any documents that, if revealed, would pose a threat to United States security.  The court noted that the district court's three detention hearings, at which the defendant could present his own witnesses and cross-examine any Government witnesses, and its statement leaving open the possibility of more hearings if circumstances warranted, were "adequate."  Id. at 82.

In this case, the Government's purposes of preventing harm to those whom Basciano may wish to harm and of inhibiting his ability to oversee the operations of the Bonanno crime family, widely known for its propensity to order and commit violent acts, are legitimate purposes.  See El-Hage, 213 F.3d at 81-82 (holding that the Government's objective of preventing communication to others who might carry out terrorist acts was a legitimate objective).  I now turn to whether the Government has offered sufficient evidence that Basciano is in fact a danger to others, and if so, whether the restrictive conditions under which he is currently confined are

rationally related to the purpose of curtailing that dangerousness.  In other words, the question is whether the Government's response has been reasonable or "arbitrary and capricious."

A.    Evidence of Basciano's Dangerousness

I agree with Judge Levy that there is ample evidence to support the conclusion that Basciano has sought to conduct criminal activity, including acts of violence, from prison.  I emphasize from the start that the Government has offered evidence not of a single such instance, but rather of a pattern of discussions and actions that suggest an intent to cause harm to individuals and conduct criminal activity from inside the prison walls.  Basciano has been recorded expressing murderous intentions toward Patrick DeFilippo and discussing a plot to kill Andres, for which he now faces criminal charges.  Cicale's testimony, though in tension with other testimony on the matter, is that Basciano gave Cicale permission to kill Michael Mancuso or have him killed.  Basciano is on record saying that he has used several sources to pass messages from prison to his associates regarding the affairs of the Bonanno organized crime family, known for committing violence in furtherance of its criminal enterprise.

This court has now presided over two trials of Basciano, at which the court heard extensive testimony of Basciano's position in the Bonanno family, his capacity to commit acts of violence, his attempts to run the Bonanno family from prison and quite possibly order murders from prison.  The conclusion of the second trial in July 2007, subsequent to Judge Levy's R&R, was Basciano's conviction before this court of the brutal murder of Frank Santoro.  While the court does not suggest that the Santoro murder involved activity that occurred during Basciano's incarceration, the testimony at the trial and Basciano's subsequent conviction are further testament to Basciano's position in the Bonanno family and his willingness and ability to carry

19

out acts of violence in furtherance of the Bonanno criminal enterprise. This information, combined with the evidence noted above, buttresses the Government's view that Basciano's words may not constitute idle threats.

The court is cognizant of the fact that the defense has called into question the allegation that Basciano gave Cicale permission to murder Mancuso. Were Cicale's testimony about Mancuso the only evidence of Basciano's desires and efforts to harm others, the court might be convinced that the restrictive conditions were an overreaction. Under the totality of the evidence in the record, however, merely calling into question one of the discrete pieces of evidence offered to establish Basciano's dangerousness does not render the Government's response "arbitrary and capricious" under the deferential standard set forth in <u>Bell</u> and <u>El-Hage</u>. As in <u>El-Hage</u>, there is "ample evidence" here of Basciano's extensive Mafia connections, of his consistent contact and efforts to communicate with those connections from prison, and his stated intent to commit acts of violence against certain individuals.[8]

As for the alleged "hit list," I find that there is sufficient evidence of Basciano's dangerousness to justify the Government's safety concerns quite apart from a specific finding that the list is a hit list. The defense correctly notes that Basciano's transfer from general population to the SHU and the imposition of the SAMs were triggered by the discovery of the list and by evidence in the Government's possession that Basciano intended to murder those on the

---

[8] Obviously, <u>El-Hage</u> is distinguishable in that it involved alleged plots to commit terrorist acts with the potential to cause the deaths of many people and to otherwise compromise national security. The court views Basciano's connections to a violent Mafia organization and his threats against certain individuals as a difference in the degree of violence he may be capable of initiating from prison rather than as a difference in kind. Thus, this distinguishable feature of <u>El-Hage</u> does not render it inapposite.

list.  Thus, Basciano takes the position that his evidence of a contrary intent necessarily undermines the basis for the restrictive conditions.  Despite the temporal relation between the discovery of the list and Basciano's removal from general population, I decline to take such a narrow view of the bases for his placement in SHU and imposition of the SAMs.  Given the extensive prior evidence of Basciano's dangerousness and the evidence in the Government's possession about the list, the Government reasonably concluded that the list further supported its conclusion that Basciano posed a danger to others.  I do not agree with the Government's contention that the evidence Basciano proposes to offer fails to call into question the evidence the Government submitted to Judge Levy (though it is a significant oversight that Defendant has merely described this purported evidence rather than provided witness affidavits).  I do agree, however, that merely calling the nature of the list into question, given the other "ample evidence" supporting Basciano's dangerousness, would not suffice to render Basciano's conditions of confinement unconstitutional.  I therefore find that an evidentiary hearing on the issue is not warranted.

Finally, I address Defendant's contention that this court's decision not to recuse itself after discovery of the list is in conflict with Judge Levy's finding that the Government's evidence "strongly indicates" the list is a hit list.  The court's November 30, 2006 opinion found that "it appears that *one of Basciano's objectives* in writing the May 2006 list and filing this motion is to 'engineer' this court's recusal."  (November 30, 2006 Memorandum and Order, Case Nos. 03-CR-929 and 05-CR-060 at 4) (emphasis added).  Earlier in the opinion, the court wrote that "if the court concludes that recusal is one of the objectives underlying the threat, irrespective of whether or not the threat is taken seriously," then recusal is not mandated.  (Id. at 3.)  Nowhere in

the opinion did the court find that the list was not a hit list, and indeed, the decision to deny the recusal motion was based solely on the court's finding that recusal was one of Basciano's objectives. I make no finding here, as I made no finding before, on whether or not the list is a hit list in addition to functioning as a recusal tool. I note simply that the court's recusal decision and Judge Levy's conclusion about the list are not mutually exclusive. I also caution that the court's decision to decline to make a definitive finding on the list should not be construed as a pronouncement by implication in either direction.

     B.    Are Basciano's Conditions of Confinement a Reasonable Response to His Dangerousness Under the Four-Factor Test in El-Hage?

Given that the evidence of Basciano's dangerousness is "ample," the question remains whether the Government's response is rationally related to the purpose of keeping Basciano from harming others and otherwise conducting dangerous criminal activity in prison. As a general matter, I conclude that placing Basciano in the SHU and removing him from the general prison population is a rational response to the Government's legitimate purpose. I discuss some caveats to that conclusion below.

As for the first El-Hage factor, limiting Basciano's ability to communicate with other prisoners and with visitors who might communicate with criminal associates has a valid, rational connection to the legitimate purpose of protecting those Basciano may seek to harm. See United States v. Ali, 396 F. Supp. 2d 703, 709 (E.D.Va. 2005) (holding that the Government had established a valid rational connection between SAMs and the Government's legitimate national security interest where the intent was to restrict Defendant's communications with other violent jihadists outside the jail). The evidence in the record is clear that Basciano consistently seeks to

communicate with criminal associates when he is housed in the general prison population.

As to whether Basciano has alternative means to exercise the right at issue, namely his right to communicate with others and to exercise his right to counsel as a pretrial detainee, he currently is allowed to meet with and talk to his attorneys in private and to his immediate family members under certain monitoring conditions.  This allowance gives Basciano the ability to prepare his defense and to have social visits under conditions that would not allow him to pass dangerous messages.  Thus, even given his dangerousness, he has been allowed alternative means to exercise his rights, in satisfaction of the second El-Hage factor.  See Ali, 396 F. Supp. 2d at 709 (noting that the Defendant was allowed communication with his lawyers and family, which was sufficient to satisfy the second prong of the El-Hage test).  In addition, Kenneth Haas of the MCC has attested that there are no alternative housing arrangements at MCC in New York, or to his knowledge at MDC Brooklyn, which would insure that Basciano does not cause harm to others.  (See Affidavit of Kenneth Haas ("Haas Aff.") filed April 13, 2007, at 3.)  Haas specifically noted that housing Basciano in general population would "make it extremely" difficult to prevent him from passing orders to commit violence outside prison.  (Id.)  Thus, there does not appear to be an alternative housing option that would allow Basciano more freedom to communicate with others while still inhibiting his ability to communicate prohibited messages.

Third, Haas has also attested that Basciano's presence in general population "would make it extremely difficult for staff" to prevent Basciano from passing orders to commit violence. (Haas Aff. at 3.)  By implication, attempts to monitor Basciano in general population likely would have a significant impact on prison staffing requirements, and by extension other inmates and prison resources generally; this factor thus weighs in favor of not releasing Basciano into

general population under the third El-Hage factor.  See El-Hage, 213 F.3d at 82.

Fourth, and finally, it is reasonable for the Government, for the reasons already noted above, to conclude that there are no "ready alternatives" to Basciano's current conditions of confinement, particularly release into the general prison population.  See id. (holding that it was reasonable for the Government to find that the alternative of confinement in the general prison population was "unacceptable" because the Defendant's dangerousness arose out of the information he might communicate to others).  Similar to the facts and reasoning in Ali, the court takes note that "the government has not been inflexible with the implementation of the SAMs upon Defendant."  Ali, 396 F. Supp. 2d at 710.  Both the Government and BOP personnel have indicated to the court their ongoing efforts to provide reasonable increases in the number of phone calls Basciano is allowed to family members, to allow reasonable increased visitation with family members, to allow correspondence between Basciano and his five-year-old son, and to continue to improve the efficiency of Basciano's meetings with his lawyers and his receipt of legal mail.  In addition, Basciano has been allowed a non-contact visit at the United States District Courthouse with his five-year-old son and Debra Kalb, (December 14, 2007 Order, Docket Entry #40), and the Government has indicated that it will not oppose similar visits in the future.  Thus, the flexible implementation of the SAMs weighs in favor of the conclusion that the SAMs are not punitive in nature and do not violate Basciano's due process rights.  See id. (noting that similar concessions by the government "suggests to the Court that the government's implementation of the SAMs has been reasonable, and is not punitive in nature.").

As for Defendant's contention that he is inordinately focused on his conditions of confinement to the detriment of his ability to assist in his defense, I have found no legal support

for allowing a dangerous inmate to be removed from restrictive conditions on that basis. Similarly, I reject Basciano's argument that the restrictions should be lifted because they hamper his lawyers' ability to develop mitigation evidence and to otherwise prepare for the penalty phase of the next trial. Thusfar in the death penalty litigation, the court has appointed under the Criminal Justice Act experienced lead trial counsel, learned counsel, two additional attorneys to assist with research and drafting papers, a paralegal, and an investigator. In short, Basciano is represented by a team of highly skilled professionals. I have every confidence that counsel will pursue their obligations diligently under the circumstances but do not find the increased difficulty they may have to be a sufficient basis for overriding the reasonable decision to place Basciano in his current conditions.

Finally, despite rejecting Basciano's arguments in favor of release into the general prison population and removal of the SAMs, the court is concerned about the ongoing difficulties Basciano has had recently in receiving legal mail and in effectively and efficiently meeting with his attorneys at the MDC. "[I]n the context of the right to counsel, unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right. As the Supreme Court has recognized, to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001) (citation and internal quotation marks omitted). Defense counsel has informed the Government and this court repeatedly, most recently in a January 1, 2008 letter and at a January 10, 2008 status conference, (see Letter to the court from Richard Jasper, Esq., Learned Counsel for Defendant Basciano (Docket # 383, Case No. 05-CR-060)), that Basciano's lawyers routinely wait for extended periods of time to be escorted to see their client and to be

escorted from their visits with him.

Representative of these complaints is Mr. Jasper's experience on December 26, 2007, when he waited for one hour to see Basciano after arriving at the MDC and then waited three and one half hours after his meeting ended to be escorted from the SHU to the main lobby. In addition, as of the date of Mr. Jasper's letter, Basciano had not received legal mail that had been mailed some nine days earlier. (Id.) This court cannot countenance pretrial conditions of confinement that, though warranted generally by Basciano's demonstrated dangerousness, in practical effect significantly restrict Basciano's attorneys' ability to prepare a defense in this case. The Government and BOP personnel have repeatedly told the court that they are "working on" addressing these issues and better facilitating Basciano's right to meet with counsel and have access to legal mail. The problem Basciano's lawyers have had in visiting him has been persistent, however, and if the BOP chooses to implement the SAMs, it must insure that its staff has the capacity to administer them in a way that protects Basciano's rights.

Moreover, Basciano's attorneys have been appointed pursuant to the Criminal Justice Act, and many taxpayer dollars are being wasted on the hours they spend waiting in the MDC. In this court's view, such a misuse of valuable resources cannot be sanctioned. While the court has no reason to question the intentions of the BOP, the results of the efforts to date surrounding Basciano's counsel visits and his receipt of legal mail have been unacceptable to the court.

Therefore, in denying Basciano's habeas petition today, I invite defense counsel to continue to keep the court apprised of their efforts to confer with their client efficiently and effectively. If problems persist, defense counsel should so advise the court so that the conditions under which Basciano is confined can be adjusted to facilitate his access to counsel.

## IV.    Conclusion

For the reasons discussed above, Basciano's petition for a writ of habeas corpus is

DENIED.  His request for an evidentiary hearing is also DENIED.


SO ORDERED.



                                          ___ s/ Nicholas G. Garaufis ___

Dated: January 14, 2008                         NICHOLAS G. GARAUFIS
      Brooklyn, N.Y.                         United States District Judge